## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

WALSH CONSTRUCTION COMPANY
PUERTO RICO,
Plaintiff,

v.

UNITED SURETY AND INDEMNITY
COMPANY,
Defendant.

Civil No. 12-1401 (GLS)

## OPINION AND ORDER

Walsh Construction Company Puerto Rico ("WCC") filed breach of contract claims against United Surety and Indemnity Company ("USIC") seeking compensation under a Subcontractor Performance Bond, which guaranteed the performance by InSite Corporation in the project named Seismic Correction Phase II/Outpatient Addition. Docket No. 1. The instant case was stayed on September 28, 2015, pending the outcome of litigation before the U.S. Bankruptcy Court in In re: Insite Corporation, Bank. Case No. 11-11209 (MCF). Docket No. 179. The stay was lifted on July 1, 2022. Docket No. 197. Both sides moved for summary judgment at Docket Nos. 202 and 205. On July 19, 2024, the Court issued an Opinion and Order finding in favor of WCC and against USIC. Docket No. 237. Having adjudicated liability against USIC, a bench trial on damages was held on March 11, 12, 13, and 14, 2025. Docket Nos. 292-295. WCC presented the testimony of Mark Brunski and Dennis González-Sánchez. USIC presented the testimony of Roque Pérez-Frangie. Documentary evidence was admitted and arguments were heard. The parties submitted post-trial briefs at Docket Nos. 305-306.

### I.    Findings of Fact

After hearing the testimonies of the witnesses and examining the documentary evidence submitted by the parties, the Court makes the following findings of fact:

1.    WCC is a corporation organized under the laws of the State of Illinois, with principal place of business in Illinois. Docket No. 290 at Stipulated Facts No. 1.

2.    USIC is a corporation organized under the laws of Puerto Rico, which is authorized by the Insurance Commissioner of Puerto Rico to issue performance and payment bonds for construction projects. Docket No. 290 at Stipulated Facts Nos. 2-3.

3.    USIC is also certified by the Government of the United States to issue performance and payment bonds for federal construction projects. Docket No. 290 at Stipulated Facts No. 4.

4.    On or about September 30, 2010, the Department of Veterans Affairs awarded WCC a contract titled Seismic Correction Phase II, Outpatient Addition (the "Project"). Opinion and Order at Docket No. 237 Uncontested Facts No. 1; Docket No. 290 at Stipulated Facts No. 5.

5.    WCC entered in a subcontract with InSite Corporation ("InSite") on November 23, 2010, for the performance of certain construction services in the Project (the "Subcontract"). Opinion and Order at Docket No. 237 Uncontested Facts No. 2; Docket No. 290 at Stipulated Facts No. 6; Joint Exhibit 1.

6.    The Subcontract described the Subcontractor's Work as "Furnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Concrete and Masonry as more completely described in the exhibits attached hereto, in strict compliance with the plans and specifications and as directed by Contractor." For the Subcontract Amount of $3,175,000.00. Joint Exhibit 1.

7.    The scope of work of InSite included vertical and horizontal construction of roof decks and miscellaneous construction or masonry. This included providing all materials, labor, and equipment and ancillary costs to place permanent concrete, which included reinforcing steel and any formwork to hold up the desired shapes and strengths in place until the formwork could be removed. Transcript of the Hearing on March 11, 2025 at Docket No. 299 ("TR1") 27 ¶¶ 8-17. It also included providing shop drawings to be reviewed and approved by the project architect and engineer, so that materials could be fabricated, and delivered to the site, rebar placed according to shop drawings and concrete poured in time. TR1 44 ¶¶ 20-25, 45 ¶¶ 1-7. It also included procuring, purchasing, and placing all components of the lightweight concrete on the Project. TR1 37 ¶¶ 17-25, 109 ¶¶ 7-14; Transcript of the Hearing on March 12, 2025 at Docket No. 300 ("TR2") 96 ¶¶ 17-21.

8.  The Subcontract provides that "The Subcontractor will complete all Work for the Subcontract Amount." Joint Exhibit 1. The Subcontract was a lump sum all-inclusive contract. TR1 28 ¶¶ 7-8; TR2 at 104 ¶¶ 18-21.

9.  InSite's projected subcontracted work on the Project could impact the project schedule and/or the critical path. TR1 28 ¶¶ 9-12, 44 ¶¶ 2-25, 45 ¶¶ 1-7, 46 ¶¶ 1-15.

10.  The critical path of a project is a sequence of events that must happen in a certain order within a certain time frame so that the overall project can be completed in the time frame required by the contract. TR1 28 ¶¶ 15-18. If a scope of work is on a project's critical path and gets delayed, it has a negative impact on the project schedule because the trailing activities are either not allowed to start or the duration of those trailing activities must be rearranged or shortened. TR1 29 ¶¶ 8-15.

11.  USIC issued a Subcontractor Performance Bond on March 22, 2011 (the "Bond") in the amount of $3,175,000, naming WCC as obligee and InSite as principal, to secure the faithful performance of InSite's obligations under the Subcontract with WCC. Opinion and Order at Docket No. 237 Uncontested Facts No. 3; Docket No. 290 at Stipulated Facts No. 7.

12.  The Bond provides:

Upon declaration that Subcontractor is in default, Obligee may proceed to perform the Subcontract Work in accordance with the terms of the Subcontract. Obligee's cost to perform Subcontract Work shall be credited against any remaining Subcontract balance and then reimbursed by Surety. Reimbursement by Surety shall reduce the penal sum of this Bond by the amount of reimbursement to Obligee. Docket No. 1-2 at Paragraph 4(f).

13.  The Bond provides:

The Surety shall be liable for:

a.  The responsibilities of the Subcontractor for correction of defective work and completion of the Subcontract Work.

b.  The responsibilities of the Subcontractor for additional legal and design professional costs resulting or arising from the Subcontractor's default, or resulting or arising from the

actions or failure to act of the Surety under Paragraph 4 herein.

c.      The responsibilities of the Subcontractor for damages caused by the performance or non-performance of the Subcontractor.

d.      The Surety's liability under this Paragraph 6 shall not exceed, in the aggregate, the penal sum set forth on the cover page of this Bond, subject to Paragraph 2. Docket No. 1-2 at Paragraph 6.

14.     The Bond provides:

Surety agrees to pay Obligee its reasonable attorney's fees and costs in the event that suit on this Bond is commenced and successfully prosecuted by Obligee. Docket No. 1-2 at Paragraph 7.

15.     The Bond provides:

In the event of a dispute between Surety and Obligee related to the Subcontract or Bond, then either Surety or Obligee may institute litigation in the state or federal court where the project is located. Docket No. 1-2 at Paragraph 10.

16.     Mark Brunski was the WCC project manager of the Project. He was responsible for all activities on the project, which included meeting with the subcontractors, processing paperwork, maintaining documents, and meeting with the owner of the Project. TR1 24 ¶¶ 8-12, 49 ¶¶ 1-8.

17.     The Project lasted 35 months. TR1 24 ¶¶ 17-19.

18.     WCC began to supplement InSite's scope of work in August 2011. TR1 76 ¶¶ 11-22. InSite stopped performing work in the Project in December 2011. TR1 66 ¶¶ 15-24. InSite abandoned the Project without completing its scope of work in March 2012. TR1 70 ¶¶ 5-10.

19.     USIC did not complete InSite's scope of work. TR1 75 ¶¶ 22-25.

20.     WCC had to spend approximately four (4) months (from December 2011 through March 2012) supplementing InSite's work or transitioning prior to completely taking over InSite's work in April 2012. This means that WCC had to procure equipment, manpower, and materials needed to complete the concrete work so that it could

take over InSite's work on the Project. TR1 76 ¶¶ 11-22, 77 ¶¶ 3-25, 78 ¶¶ 1-4.

21.     WCC kept in a separate filing system evidence of all invoices of labor, materials, rentals, and equipment, which were costs of completing the work for InSite. These invoices were reviewed by Brunski. He made sure that the invoices were correct and that the work that was performed was within the scope of InSite's work. Brunski was in the field and on the Project every day. He had the authority to, and did, approve all the invoices for payment. The invoices pertaining to InSite's scope of work bear Brunski's signature and/or initials. TR1 79 ¶¶ 2-20, 87 ¶¶ 19-20, 88 ¶¶ 11-25, 90 ¶¶ 1-25.

22.     WCC incurred in $11,693.50 for equipment operating expenses to perform and finish InSite's scope of work in the Project. Brunski received those invoices, approved the invoices for payment, and approved payment of expenses at Plaintiff Exhibit Nos. 12, 13, 14, 15, 16, 17, 18 and 19. TR1 at pp. 93-107.[1]

23.     WCC incurred in $965,859.32 for lightweight concrete and aggregate of concrete expenses to perform and finish InSite's scope of work in the Project. Brunski received those invoices, approved the invoices for payment, and approved payment of expenses at Plaintiff Exhibit Nos. 20, 21, 22, 23, 24 and 25. TR1 at pp. 108-130.

24.     There was lightweight aggregate of concrete available in Puerto Rico. TR2 87 ¶¶ 1-23.

25.     As required by the owner of the Project, WCC nonetheless brought from the United States through Star Ready Mix 2,000 tons of the lightweight aggregate. TR2 89 ¶¶ 4-25. WCC was not reimbursed by the owner of the Project for the lightweight aggregate. TR2 96 ¶¶ 8-21.

26.     Star Ready Mix was contracted by WCC to mix the concrete. TR2 98 ¶¶ 5-13. WCC paid Star Ready Mix $240.00 per cubic yard of lightweight concrete. TR2 99 ¶¶ 4-17, 103 ¶¶ 8-25.

27.     WCC incurred in $33,863.06 for temporary construction materials expenses to perform and finish InSite's scope of work in the Project. Brunski received those invoices, approved the invoices for payment,

---

[1]     In its post-hearing brief, WCC represented that the amount of equipment operating expenses evidenced by the invoices at Plaintiff Exhibits 12-19 totaled $32,866.42. But the total amount evidenced in those exhibits is $11,693.50.

and approved payment of expenses at Plaintiff Exhibit 26. TR1 at pp. 132-135.

28.    WCC incurred in $252,848.44 for construction materials expenses to perform and finish InSite's scope of work in the Project. Brunski received those invoices, approved the invoices for payment, and approved payment of expenses at Plaintiff Exhibit 27. TR1 at pp. 135-136.

29.    WCC incurred in $392,863.84 for equipment rental expenses to perform and finish InSite's scope of work in the Project. Brunski received those invoices, approved the invoices for payment, and approved payment of expenses at Plaintiff Exhibit 31. TR2 at pp. 4-7.

30.    WCC incurred in $842,065.57 for subcontract expenses to perform and finish InSite's scope of work in the Project. Brunski received those invoices, approved the invoices for payment, and approved payment of expenses at Plaintiff Exhibit 28. TR1 at pp. 136-138.

31.    WCC had to approve a change order with a subcontractor of steel to address design changes made by the owner of the Project. Steel work had to be modified due to defective work performed by InSite. TR1 150 ¶¶ 17-25, 151 ¶¶ 19-25. The amount paid by WCC to correct InSite's defective work was $21,352.00. TR1 152 ¶¶ 2-20. The change order was signed by WCC and the subcontractor, was paid in its entirety by WCC, and such a payment was made to address defective work by InSite. TR1 155 ¶¶ 22-25, 156 ¶¶ 1-11. WCC incurred in $21,352.00 to fix defective work performed by InSite.

32.    WCC paid InSite $1,473,523.00 of the Subcontract amount. The remaining amount in InSite's Subcontract was $1,701,477.00. TR2 171 ¶¶ 22-24, 172 ¶¶ 1-13.

33.    The Project was substantially completed in August 2013. TR2 125 ¶¶ 12-17.

## II.    Conclusions of Law

### 1.    Motion *In Limine* to Preclude Prejudgment Interest Claims

WCC asserted two counts of breach of contract against USIC seeking compensatory and consequential damages, together with interest and costs, attorney's fees, delay damages, and punitive damages. Docket No. 1. In the Amended Joint Pretrial Report, WCC claimed to be entitled to prejudgment interests on the costs to complete the work ($782,576.61) and on fees and expenses

incurred by WCC through March 6, 2024 ($446,753.64). Docket No. 274 at p. 5. USIC moved the
Court to strike WCC's claims for prejudgment interests under Article 1061 of the Puerto Rico
Civil Code.[2] Docket Nos. 260, 269. WCC opposed. Docket Nos. 262, 281. WCC is not entitled to
prejudgment interests under Article 1061 of the Puerto Rico Civil Code and USIC's motion is
**GRANTED**.

In a case premised on diversity jurisdiction, such as this one, the Court applies state
substantive law. Puerto Rico law on prejudgment interests thus applies here. In re Redondo
Construction, Corp., 820 F.3d 460, 464 (1st Cir. 2016). There are two avenues through which to
seek the imposition of prejudgment interests under Puerto Rico law: Rule 44 of the Puerto Rico
Rules of Civil Procedure and Article 1061 of the Puerto Rico Civil Code. In re Redondo
Construction Corp., 505 B.R. 388, 396 (Bank. D.P.R. Jan. 13, 2014); In re Industrias Vassallo,
Inc., 2014 WL 4960901 *2 (Bank. D.P.R. Oct. 2, 2014); 31 P.R. LAWS ANN. tit. 31, § 3025 (2019).
Rule 44 of the Puerto Rico Rules of Civil Procedure requires a finding of temerity, which was not
sought by WCC. Article 1061 of the Puerto Rico Civil Code does not require a finding of temerity.
Rather, Article 1061 provided that when an "obligation consist of the payment of a sum of money,
and the debtor should be in default, the indemnity for damages, if not otherwise stipulated, shall
consist of the payment of the interest agreed upon, and should there be no agreement, the payment
of the legal interest." 31 P.R. LAWS ANN. tit. 31, § 3025 (2019). One of the earliest cases of the
Puerto Rico Supreme Court analyzing Article 1061 is Rivera v. Crescioni, 77 D.P.R. 47, 77 P.R.R.
43 (1954). The plaintiff in that case filed a breach of contract claim stemming from the sale of
juices. The allegation was that the defendant had received the product and failed to pay for the
same. Plaintiff sought payment of the sales amount, plus expenses and interests. The Puerto Rico
Supreme Court noted that the amount owed was a liquid debt. Id. at 52. And that the computation
of prejudgment interests begins on the date in which the liquid debt accrues. Id. at 54. To this end,
the Puerto Rico Supreme Court explained that prejudgment interests begin to accrue as soon as the
debtor incurs in default ("mora" in Spanish) but explained that such a claim for prejudgment
interests is not part of the original obligation. Id. at 55-56. Such a claim is considered an
independent obligation, imposed as a penalty on the debtor to compensate the creditor for the
damages suffered due to the delay in payment. Id. at 56. Because the imposition of these

_____

[2]        Since the controversies in this case stem from a bond issued in the year 2011, the Puerto Rico Civil
Code of 1930 applies.

<u>Walsh Construction v. United Surety & Indemnity Co.</u>
Civil No. 12-1401 (GLS)

prejudgment interests is not part of the underlying obligation, imposition of prejudgment interests is not automatic and failure by the creditor to request the imposition of the penalty could constitute waiver. <u>Id</u>.

In the case of <u>Valcourt v. Iglesias</u>, 78 D.P.R. 630, 78 P.R.R. 598 (1955), the Puerto Rico Supreme Court discussed the concept of "mora" or the type of default required under Article 1061 to seek the imposition of prejudgment interests. The Puerto Rico Supreme Court distinguished between that which it termed "culpable delay" and a mere delay in payment. <u>Id</u>. at 640. <u>See</u> <u>In re Redondo Construction Corp.</u>, 505 B.R. 388, 398 (Bank. D.P.R. Jan. 13, 2014) (distinguishing "mora" or faulty delay (default) from mere delay, when the performance of the obligation is not subject to an absolute deadline). The Puerto Rico Supreme Court held that the culpable delay of the debtor is what triggers the accrual of Article 1061 prejudgment interests. <u>Valcourt</u>, 78 D.P.R. at 640. And that a debtor incurs in culpable delay only after the creditor has demanded judicial or extrajudicial satisfaction of an overdue obligation. <u>Id</u>. at 638 ("The mere delay in the performance of an obligation is a legal situation different from 'a special state of default.' For mere delay to become a default, it is necessary to make demand on the debtor by the judicial or extrajudicial means available by law."). <u>See also</u> Article 1053 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. tit. 31, § 3017 (2019). As such, according to the Spanish treaties discussed in <u>Valcourt</u>, whereas delay "in the case of liquid and demandable amounts" becomes a default triggering Article 1061 prejudgment interests after the filing of the complaint, delay in the payment of "unliquidated or undetermined amounts, which must be determined by the trial court" becomes a default only after the entry of judgment. <u>Id</u>. at 638-639. Article 1061 prejudgment interests attach only when the debtor has incurred in culpable delay, which in the case of a liquid debt may occur after the creditor has made an extrajudicial demand for payment or at the time when the complaint is filed. But when the debt is unliquidated or undetermined, judicial demand for purposes of the imposition of prejudgment interests under Article 1061 does not occur until the entry of judgment in favor of the creditor. The Puerto Rico Supreme Court in <u>Valcourt</u> closed by stating: "it may be generally affirmed that not every nonperformance of an obligation is the debtor's fault, and that the most feasible way of discovering the reasons for nonperformance is not to presume them beforehand but to wait for the corresponding proof before its judicial adjudication." <u>Id</u>. at 641 (citations omitted).

Recently, in the case of Consejo de Titulares del Condominio Playa Azul II v. MAPFRE PRAICO Insurance Co., 2024 T.S.P.R. 140 (English translation at Docket No. 278-1), the Puerto Rico Supreme Court summarized the requirements of Article 1061 of the Puerto Rico Civil Code. The issue in Condominio Playa Azul II was the application of prejudgment interests to an amount the insurance company admitted was owed to the insured. Plaintiffs sought the imposition of prejudgment interests from the time they filed the amended complaint claiming the amounts admittedly owed by the insurance company until the entry of judgment by the Puerto Rico Court of Appeals ordering the insurance company to pay the admitted amount. The Puerto Rico Supreme Court discussed the requirements for a finding of culpable delay or default, and the imposition of prejudgment interests. As stated therein, these are: (1) the existence of an obligation to deliver or do something; (2) that the creditor demand compliance from the debtor judicially or extrajudicially; (3) that the obligation be payable and liquid, and is overdue; (4) that the delay be attributable to the debtor; and (5) that the delay in performance was the debtor's fault. Id. at 6 (citations omitted). Although the debt admitted by the insurance company became liquid and payable upon entry of judgment by the Puerto Rico Court of Appeals, the Puerto Rico Supreme Court held that plaintiffs were not entitled to prejudgment interests under Article 1061 because they failed to move the court in a timely fashion. Id. at 11-12. Nonetheless, the requirements discussed in Condominio Playa Azul II are entirely consistent with the expressions in Valcourt— culpable delay to trigger imposition of prejudgment interests under Article 1061 does not occur until a liquid and payable (overdue) debt is demanded, and a debt is not liquid and payable if the amount is yet to be determined by the Court.

WCC asserted claims for breach of contract against USIC under the Bond. The Court held that USIC is liable under the Bond. But the amounts claimed under the Bond are clearly disputed and undetermined. Otherwise, a trial on damages, as the one requested by WCC and held by the Court, would have been unnecessary. Indeed, even though the terms of the Subcontract and the Bond allowed WCC to take over InSite's scope of work and pursue reimbursement from USIC,[3] the costs incurred by WCC subject to reimbursement had to be determined by a trier of fact. Under no scenario could these costs and expenses be deemed liquid and payable thereby triggering USIC's culpable delay (mora) in payment while in litigation. USIC could only be deemed in

---

[3]     See Sections 8.1 and 8.2 of the Subcontract at Docket Nos. 202-3, 205-2 and the Bond at Docket No. 1-2 at Paragraph 4(f).

<u>Walsh Construction v. United Surety & Indemnity Co.</u>
Civil No. 12-1401 (GLS)

"mora" or default of its obligations under the Bond upon the entry of a judgment on damages. <u>See e.g.</u>, <u>In re Industrias Vassallo, Inc.</u>, 2014 WL 4960901 *2 (Bank. D.P.R. Oct. 2, 2014) (request for payment under bond and payment disputed, no obligation to pay or potential default in payment until final adjudication of amount owed in favor of debtor, prejudgment interests under Article 1061 unwarranted). <u>Compare</u> <u>Reyes v. Banco Santander de P.R., N.A.</u>, 583 F.Supp. 1444, 1446-1447 (D.P.R. August 9, 1984) (prejudgment interests due on obligation to pay a sum certain of money, which accrues from the time payment was demanded); <u>Colón v. Blades</u>, 717 F.Supp.2d 175, 186-187 (D.P.R. June 15, 2010) (sum certain of money owed, interests accrue from demand of payment).

WCC's reliance on <u>In re Redondo Construction Corp</u>. is misplaced. Redondo contracted with the Puerto Rico Highway and Transportation Authority (PRHTA) to work on three construction projects. The contractor in <u>Redondo</u> sought payment for substantially completed work from the PRHTA. During the pendency of the district court proceedings, Redondo filed for bankruptcy and subsequently filed three complaints against PRHTA for money owed under the construction contracts. The Bankruptcy Court imposed prejudgment interests on the amounts due by the PRHTA. The First Circuit reversed and instructed the Bankruptcy Court to specify under which authority it sought to impose prejudgment interests on the amounts claimed by the contractor. On remand, the Bankruptcy Court explained that the PRHTA had payment obligations to Redondo, which stemmed from reciprocal obligations under the construction contracts. And that, once the contractor complied with its obligations to construct and achieved substantial completion of the projects, the PRHTA's payment obligations were triggered. The Bankruptcy Court imposed prejudgment interests on those payment obligations with an accrual date as of the stipulated substantial completion until final payment of the amounts owed by the PRHTA. <u>In re Redondo Construction Corp.</u>, 505 B.R. at 400-401 (finding that Redondo did not waive its claim for prejudgment interests). The First Circuit in <u>In re Redondo Construction, Corp.</u>, 820 F.3d 460 (1st Cir. 2016), affirmed the Bankruptcy Court's findings with respect to Redondo's right to claim prejudgment interests from the date of substantial completion. <u>Id</u>. at 467. But the First Circuit reversed the Bankruptcy Court's decision that prejudgment interests would accrue until final payment by PRHTA. It reasoned that prejudgment interests cannot overlap with post judgment interests under 28 U.S.C. § 1961 and that the accrual of prejudgment interests on the amounts due by the PRHTA would conclude at judgment rather than upon complete satisfaction of the

10

<u>Walsh Construction v. United Surety & Indemnity Co.</u>
Civil No. 12-1401 (GLS)

obligation. <u>Id</u>. at 468. Whether the amounts owed by the PRHTA were disputed was not at issue in <u>Redondo</u>. Rather, the dispute in <u>Redondo</u> centered around whether the claim for prejudgment interests had been waived and when the accrual of prejudgment interests would begin and conclude. Prior to the trial on damages, USIC's reimbursement obligations under the Bond were still to be determined and subject to proof by WCC. USIC is not entitled to prejudgment interests under Article 1061 of the Puerto Rico Civil Code over any of the amounts owed by USIC on account of completion of InSite's work or on accrued attorneys' fees. <u>Valcourt</u>, 78 D.P.R. at 638-639; <u>see</u> <u>Midrose Foods, Inc. v. Roman</u>, 454 F.2d 1159, 1160-1161 (1st Cir. 1972) (reversing award of interests computed from the date in which notes were executed and holding that prejudgment interests should be computed from the due date of the notes, which is when the notes became due and payable).

### 2. Evidentiary Matters Raised at Trial

a. <u>Exclusion of Invoices and Checks at Plaintiff Exhibits 12-28 and 31 as Inadmissible Hearsay</u>

USIC objected to the admission of Plaintiff Exhibit Nos. 12-28 and 31, which contain invoices and cancelled checks to establish the expenses incurred by WCC in performing InSite's scope of work under the Subcontract. USIC argued that Plaintiff could not establish an adequate foundation to satisfy the requirements of Federal Rule of Evidence 803(6), the business records exception to the hearsay rule. FED. R. EVID. 803(6). Specifically, that Brunski could not qualify as a "custodian or other qualified witness" under Rule 803(6), and that WCC failed to lay the necessary evidentiary foundation for the admission of the invoices or the checks.

Rule 803(6) authorizes the admission of certain documents as an exception to the prohibition against the admission of statements by an out-of-court declarant offered to prove the truth of the matter asserted. FED. R. EVID. 801(c), 802. Rule 803(6) provides that "[a] record of an act, event, condition, opinion, or diagnosis" is "not excluded by the rule against hearsay" if:

> (A) the record was made at or near the time by-or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). Whether a foundation has been properly laid for application of the exception under Rule 803(6) and whether the circumstances tend to indicate lack of trustworthiness is within the Court's discretion. United States v. Patterson, 644 F.2d 890, 900 (1st Cir. 1981). "As for the requirement that the record-keeping process be attested to by a qualified witness, it is well established that the witness need not be the person who actually prepared the record." Wallace Motor Sales, Inc. v. American Motors Sales Corp., 780 F.2d 1049, 1060-61 (1st Cir. 1985). The key question is whether the records in question are "reliable enough to be admissible." FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010). A qualified witness is simply one who can explain and be cross-examined concerning the way the records were generated and kept. Id. See also U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust v. Jones, 925 F.3d 534, 537 (1st Cir. 2019) ("there is no categorical rule barring the admission of integrated business records under Rule 803(6) based only on the testimony from a representative of the successor business."). The admissibility turns on the facts of each case. U.S. Bank Trust, 925 F.3d at 538.

Brunski was the project manager of the Project. TR1 24 ¶¶ 8-12, 49 ¶¶ 1-8. He testified that WCC kept a separate filing system with evidence of all invoices of labor, materials, rentals, and equipment, which were the costs of completing the work for InSite. These invoices were reviewed by Brunski. He made sure that the invoices were correct, that the work was performed, and that the work performed was within the scope of InSite's work. Brunski was in the field and on the Project every day. He had the authority to, and did, approve all the invoices for payment, and the invoices pertaining to InSite's scope of work bear his signature and/or initials. TR1 79 ¶¶ 2-20, 87 ¶¶ 19-20, 88 ¶¶ 11-25, 90 ¶¶ 1-25. As project manager of the Project, Brunski had first-hand knowledge of the scope of InSite's work under the Subcontract, of the materials, equipment, and work expended by WCC to perform and complete the scope of InSite's work, and whether the invoices and checks in Plaintiff Exhibit Nos. 12-28 and 31 accurately reflected those expenses and costs. See Wallace Motor Sales, Inc., 780 F.2d at 1061 (as president and stockholder of the company, the witness was well qualified to attest to the authenticity of the inventory as business

records). Indeed, all the invoices and payments in Plaintiff Exhibit Nos. 12-28 and 31 were approved and initialed by him. And Brunski testified having personal knowledge as to the way the records were made and kept and could certainly be cross-examined on their content. See R&T Roofing Contractor, Corp. v. Fusco Corp., 265 F.Supp.3d 145, 148 (D.P.R. Aug. 22, 2017) (a qualified witness is someone who can explain and be cross-examined concerning the way the records were made and kept). While Brunski did not issue the checks to pay for the expenses incurred, the "qualified witness" requirement does not require original authorship for the record of regularly conducted activity hearsay exception to apply. Id. And USIC has not argued that there is any *indicia* that the records at Plaintiff Exhibit Nos. 12-28 and 31 are not trustworthy. Id.; U.S. Bank Trust, N.A., 925 F.3d at 538-39. The records at Plaintiff Exhibit Nos. 12-28 and 31 appear reliable as Brunski unequivocally testified that he received each of the invoices, approved the invoices for payment, and approved payment of all the expenses. United States v. Moore, 923 F.2d 910, 915 (1st Cir. 1991) (ordinary business circumstances suggest trustworthiness absent contrary evidence).

The requirements for the application of Rule 803(6) are met: (1) Brunski was familiar with the business records at issue during the course of his regular job functions as project manager of the Project; (2) Plaintiff Exhibit Nos. 12-28 and 31 were made at or near the time by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records; (3) the documents were kept by WCC and Brunski in the regular course of business activity; (4) it is reasonable to expect that WCC would have kept those records to seek reimbursement for the expenses incurred to complete InSite's scope of work; and (5) Brunski personally examined each of the records at issue. See Katsenes v. U.S. Bank Trust, N.A. as Trustee for LSF9 Master Participation Trust, 2023 WL 198361, at *6 (D. Mass. Jan. 17, 2023). Plaintiff Exhibits 12-28 and 31 are admissible under the exception to hearsay in Rule 803(6) of the Federal Rules of Evidence, and USIC's objections thereto are **OVERRULED**.

b.    USIC's Objection to WCC's Expert Testimony

Dennis González-Sánchez (González-Sánchez) is an engineer with over fifty-four (54) years of experience. He has ample experience in general construction, construction management, and inspection of construction. TR2 at pp. 134-136, 156 ¶¶ 23-25. González-Sánchez has experience working with bonding companies to make recommendations as to cost estimates for the completion of construction projects left unfinished by contractors. TR2 137 ¶¶ 1-22. González-

Sánchez has previously been retained as an expert in engineering and construction matters. TR2 140 ¶¶ 8-11. WCC offered González-Sánchez as an expert in field on engineering and cost analysis, specifically to establish the direct costs incurred by WCC in completing InSite's scope of work and the costs incurred by WCC in general conditions or overhead of the Project due to the delay attributable to InSite. TR2 142 ¶¶ 11-14.[4] USIC had no objection to González-Sánchez's testimony on construction management or cost estimates but challenged the admissibility of WCC's expert testimony on actual costs incurred by WCC. TR2 145 ¶¶ 3-8. USIC argued that González-Sánchez's expertise is in engineering, construction, and cost analysis, but that his expert report and testimony at trial exceeded that expertise in that he testified as to matters pertaining to actual costs, including summaries of financial and accounting information for the purpose of corroborating the damages sought by WCC. See TR2 at pp. 155-158, 161, 173. WCC countered that USIC had González-Sánchez's report since March 2014 and failed to move to preclude any portion of the report or González-Sánchez's testimony prior to the trial. And that adding the totals of invoices and cancelled checks is a matter that does not require the expertise of an accountant. González-Sánchez's expert report, including his *curriculum vitae*, was admitted in evidence without objection from USIC and was marked as Plaintiff Exhibit 32. His testimony was heard and a ruling on USIC's objection was deferred until conclusion of trial.

The admission of expert testimony requires compliance with Rule 702 of the Federal Rules of Evidence. FED. R. EVID. 702. To determine whether an expert's testimony is sufficiently reliable, the trial judge considers whether the testimony is based on sufficient facts or data; whether the testimony is the product of reliable principles and methods; and whether the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Smith v. Jenkins, 732 F.3d 51, 64 (1st Cir 2013) (quoting Fed. R. Evid. 702) (internal quotations omitted); Rodríguez v. Hospital San Cristóbal, Inc., 91 F.4th 59, 70 (1st Cir. 2024). Expert testimony is relevant if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Id. at 66 (quoting FED. R. EVID. 702). The party seeking to introduce opinion evidence has the burden of establishing both its reliability and relevance. Rodríguez v. Quality Health Services of P.R., Inc., 2022 WL 3445348 *3 (D.P.R. Aug. 4, 2022) (quoting López-Ramírez v. Toledo

---

[4] WCC argued in its post-trial brief that the evidence in Plaintiff Exhibit Nos. 12-28 and 31 superseded the expert's computation of damages, except for direct costs of WCC by having WCC employees complete InSite's work and extended general conditions of the Project necessary to complete InSite's scope of work. Docket No. 305 at p. 8.

González, 32 F.4th 87, 94 (1st Cir. 2022) (internal quotations omitted)). An expert opinion is legally sufficient if the expert reviewed sufficient record of facts, used accepted methodology, and applied his technical expertise to draw his opinions. Ortiz De Jesús v. Reyes Burgos, Inc., 2020 WL 5520642 at *8 (D.P.R. Sep. 14, 2020).

During his testimony, González-Sánchez explained that in preparation for rendering his opinion he visited the Project, examined aerial pictures of the Project, received and analyzed job cost reports generated by WCC, examined the Project's critical path and confirmed the delay that WCC claimed was caused by InSite (i.e., negative float caused by InSite), studied the general conditions of WCC, contacted suppliers of materials and equipment to corroborate the reasonableness of the invoices, and interviewed Brunski and other WCC employees who worked on the Project. TR2 at pp. 154-163, 173. González-Sánchez explained that the way he calculated the expenses incurred by WCC was by examining the job costing reports produced by WCC, corroborating a sample of invoices produced by WCC by comparing the amounts in those invoices to the values included in the job costing report, and by contacting certain suppliers to confirm that the invoiced amount was appropriate and related to InSite's work. TR2 173 ¶¶ 10-20. González-Sánchez came up with nine (9) items of direct costs incurred by WCC to perform and complete InSite's work and assigned values to each one of those nine (9) categories. TR2 164 ¶¶ 7-22; See Plaintiff Exhibit No. 32 at p. 6. The values assigned by González-Sánchez to the categories of direct costs claimed by WCC were determined by evaluating the costs in the job cost reports produced by WCC and verifying that the costs reported by WCC were legitimate expenses associated with the completion of InSite's scope of work. TR2 165 ¶¶ 6-9, 173 ¶¶ 4-20, 186 ¶¶ 3-7. See Plaintiff Exhibit No. 32 at p. 7. González-Sánchez completed the verification through sampling of invoices and confirmation with suppliers. Transcript of the Hearing on March 13, 2025 at Docket No. 301 ("TR3") 29 ¶¶ 1-2, 30 ¶¶ 16-25, 31 ¶¶ 1-19. González-Sánchez's report fails to refer to any portion of the job costing reports and lacks the costing reports or the sampled invoices used by him to reach his conclusions. TR3 24 ¶¶ 24-25, 25 ¶¶ 1-5, 32 ¶¶ 1-11.

The methodology used by González-Sánchez to calculate the costs of supervision and labor incurred by WCC to perform InSite's work and to calculate the costs in extended general conditions incurred by WCC was not reliable. González-Sánchez explained having considered two alternate formulas for calculating the costs of supervision and labor. TR2 188 ¶¶ 3-25, 189 ¶¶ 19-25, 190 ¶¶ 1-25, 191-193. Both formulas relied on the hourly rate of five (5) WCC employees,

calculated by looking at yearly salaries and fringe benefits from payroll documents, cost codes, and interviews with WCC employees. TR2 167 ¶¶ 1-24, 187 ¶¶ 19-25, 193 ¶¶ 17-22. González-Sánchez did not include any supporting documents to substantiate the hourly rate assigned to each of the WCC employees. Further, González-Sánchez's formula assumed the four (4) months of delay testified by Brunski and eight (8) additional months of work on InSite's scope of work. But absent from his testimony and from his report is the analysis of any evidence used to conclude that completing InSite's scope of work required eight (8) additional months. See TR2 210 ¶¶ 13-21; TR3 80 ¶¶ 1-17, 81 ¶¶ 1-25, 82 ¶¶ 1-14. That was also not part of Brunski's testimony during trial and the alternate formula considered by González-Sánchez (and prepared by Brunski) did not assume that the WCC employees worked on InSite's scope of work for twelve (12) months. That alternate formula used the total months worked on the Project by each of the five (5) employees and assumed a percentage of time expended by each employee on doing InSite scope of work. González-Sánchez also did not provide a factual basis for his conclusion that four (4) WCC employees devoted 100%, and one (1) WCC employee devoted 20%, of their time to complete InSite's scope of work during those twelve (12) months. Other than a passing reference to his interview of Brunski and other WCC employees, the Court does not know how González-Sánchez confirmed the numbers of hours spent by each of the WCC employees performing InSite's scope of work. The reliability of González-Sánchez's calculation of the costs of supervision and labor is also called into question when considering that Brunski, the project manager and the person with most knowledge of the work performed by WCC employees, reached a different conclusion as to the total value that should be attributed to those costs.[5]

González-Sánchez's testimony on the computation of extended general conditions was also unreliable. González-Sánchez testified that such a claim included what he understood to be reasonable costs of general conditions based on four (4) months of extended overhead. And that in assigning a value for that claim he considered the WCC cost reports and payroll documents. TR2 at 196-202; TR3 68; Plaintiff Exhibit No. 32 at p. 13. But González-Sánchez again failed to include with his report or in his discussion during trial any reference to supporting documents that could substantiate his computations. TR3 65 ¶¶ 18-25, 66 ¶¶ 1-3. Critically, except for four (4) of

---

[5]    Brunski calculated those costs at $395,952.00 and González-Sánchez calculated the costs at $267,337.00.

the categories of costs listed by González-Sánchez in his report (i.e., the values assigned to costs of WCC supervision and labor ($267,337.00), back charges due to InSite defective work ($21,351.00), excess worker's compensation insurance ($77,880.35), and four months of extended general conditions ($341,101.38)), the computation of direct costs by González-Sánchez is inconsistent with the evidence presented by WCC through the testimony of Brunski and contained in Plaintiff Exhibit Nos. 12-28 and 31, as summarized in WCC's post-trial brief at Docket No. 305 p. 24. See TR2 at 206 ¶¶ 16-25; Plaintiff Exhibit 32 at p. 7 (calculating total costs for WCC at $2,797,650.26 (before deducting $1,701,477.00 left in the InSite Subcontract)); Docket No. 305 at p. 23-24 (calculating total costs for WCC at $3,228,036.38 (before deducting $1,701,477.00 left in the InSite Subcontract)). And, even though in its post-trial brief WCC attempted to justify why "the amounts found at Exhibits P12-P28 and Exhibit P31 supersede the values González-Sánchez assigned to Walsh's payments to suppliers and subcontractors for the completion of InSite's scope of work on the Subject Property" (Docket No. 305 at p. 8)[6], González-Sánchez prepared his report after completion of the Project and there is no basis to conclude that costs incurred by WCC would have changed after completion of the Project. Further, González-Sánchez's testimony during trial was that he stands by his calculations of the amounts paid by WCC for supplies, labor, and materials for the completion of InSite's scope of work. TR3 pp. 28-29.

As argued by USIC, González-Sánchez's testimony was not limited to issues of engineering or construction. His testimony centered around the costs and expenses incurred by WCC in completing InSite's scope of work. González-Sánchez is not an accountant and could not explain the method in which the job costing reports were prepared or kept as those were generated by WCC. See TR3 at 6 ¶¶ 21-24, 7 ¶¶ 17-25. González-Sánchez also testified that he did not review all invoices related to the InSite scope of work, but only a sample of those in the job costing report. TR3 at 8 ¶¶ 20-25, 9 ¶¶ 1-6. Under Rule 702, a testifying expert "should 'have achieved a meaningful threshold of expertise' in the given area." Levin v. Dalva Brothers, Inc., 459 F.3d 68, 78 (1st Cir. 2006) (quoting Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc., 405 F.3d 36, 40 (1st Cir. 2005)). Without undermining his vast experience as an engineer and in construction projects, González-Sánchez is not an accountant or an auditor, and has never performed accounting work. TR2 at p. 142 ¶¶ 11-14. He also does not have a degree in an accounting-related major or any

---

[6]     WCC's explanation was that González-Sánchez's report was drafted prior to the production of the invoices and checks at the exhibits of reference.

certifications pertaining to that area of expertise. That "a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields." Levin, 459 F.3d at 78 (quoting Nimely v. City of New York, 414 F.3d 381, 399 n. 13 (2d Cir. 2005)). González-Sánchez's testimony pertaining to mathematical calculations based on job costs and invoices is beyond his qualifications as an engineer. Therefore, USIC's objection to the admissibility of González-Sánchez's testimony is **SUSTAINED**.

### 3.    WCC's Claims for Breach of Contract

The Bond bound USIC to reimburse WCC the costs incurred by WCC to perform InSite's scope of work. Docket No. 1-2 at Paragraph 4(f). The Bond at Paragraph 6 also obliged USIC to the correction of any defective work and completion of the InSite scope of work, any additional legal and design professional costs resulting or arising from InSite's default or resulting or arising from actions or failure to act by USIC under the Bond, and any damages caused by InSite's performance or non-performance of the contracted work, not to exceed the penal sum of $3,175,000. Id. at Paragraph 6. And, pursuant to Article 1060 of the Puerto Rico Civil Code, the damages that may be recovered for a breach of contract claim include all those that the debtor in good faith could have foreseen and all those that could have been foreseen when the obligation was assumed. P.R. LAWS ANN. tit. 31, § 3024.

### a.    Equipment, Materials, and Subcontract Expenses

WCC submitted credible testimonial and documentary evidence to establish that it incurred in $11,693.50 on account of equipment operating expenses, $33,863.06 on account of temporary construction materials, $252,848.44 on account of construction materials, $392,863.84 on account of equipment rental expenses, and $842,065.57 on account of subcontract expenses to perform and complete InSite's scope of work in the Project. See Plaintiff Exhibit Nos. 12-28 and 31. USIC did not present any evidence to counter those costs. USIC merely relied on the opinion of its expert that the costs appeared unreasonably high and not consistent with the aerial photographs of the Project. See Transcript of Hearing on March 14, 2025 at Docket No. 302 ("TR4") at pp. 32-37. But Brunski, the project manager who visited the Project every day, testified to have caused the work to be performed, verified that the work was performed, verified that the work was within the scope of InSite's subcontracted work, and received and approved the invoices for payment. WCC

incurred in **$1,533,334.41** to complete InSite's scope of work and this amount is subject to reimbursement by USIC under the Bond.

      b.    <u>Back Charges</u>

      WCC seeks reimbursement of back charges in the amount of $21,352.00 due to InSite's defective work. <u>See</u> Docket No. 305 at p. 24. Brunski testified in no uncertain terms that a change order was generated with another subcontractor of steel to address design changes made by the owner of the Project and steel work that had to be modified due to defective work performed by Insite. TR1 150 ¶¶ 17-25, 151 ¶¶ 19-25. He also testified that the amount paid by WCC to correct InSite's defective work was $21,352.00. TR1 152 ¶¶ 2-20. Even though WCC was not allowed to submit into evidence an unexecuted copy of the change order, Brunski testified that the change order was signed by WCC and the subcontractor, that the change order was paid in its entirety by WCC, and that such a payment was made to address defective work by InSite. TR1 155 ¶¶ 22-25, 156 ¶¶ 1-11. USIC did not present any evidence to offset that testimony. WCC incurred in **$21,352.00** to cure defective work performed by InSite and this amount is also subject to reimbursement by USIC under the Bond.

      c.    <u>Lightweight Concrete</u>

      WCC seeks reimbursement for costs of lightweight aggregate, lightweight concrete, transportation of the lightweight aggregate to Puerto Rico, and pouring of the concrete in the Project. Star Ready Mix was contracted by WCC to mix the concrete. TR2 98 ¶¶ 5-13. WCC paid Star Ready Mix $240.00 per cubic yard of lightweight concrete. TR2 99 ¶¶ 4-17, 103 ¶¶ 8-25. The claim is for $965,859.32. Brunski received the invoices pertaining to that claim, approved the invoices for payment, and approved payment of expenses at Plaintiff Exhibit Nos. 20, 21, 22, 23, 24, and 25. TR1 at pp. 108-130. USIC contested the amount sought for reimbursement by relying on the language of the Subcontract and on the testimony of its expert that the amount of concrete poured on the Project exceeded the amount agreed in the specifications of the Project.

      In Exhibit XX of the Subcontract, the parties stated that "the lightweight concrete considered in this Subcontract is a 121.39 lbs/ Ft3 (4,000 PSI) by Terrassa at a cost for supply only of $139.00 per CY. Any increase in this price due to non-acceptance of designer of mix will be discussed between Walsh and Insite to reach a mutual agreement." Joint Exhibit 1. USIC and its expert refer to this language in the Subcontract to seek a reduction in the amount sought for reimbursement from $240.00 per cubic yard to $139.00 per cubic yard of lightweight concrete.

See TR4 at pp. 42-45. But the Subcontract with InSite was a lump sum all-inclusive contract, where InSite agreed to "[f]urnish all labor, materials, equipment, insurance, taxes, and supervision as required to fully fabricate, deliver F.O.B. Project and install all Concrete and Masonry" for the Subcontract Amount of $3,175,000.00. Joint Exhibit 1; TR1 28 ¶¶ 7-8; TR2 104 ¶¶ 18-21. Further, WCC established that InSite was required to provide all materials, labor and equipment, and ancillary costs to place permanent concrete in the Project. TR1 27 ¶¶ 8-17. And that InSite's scope of work included procuring, purchasing, and placing all components of the lightweight concrete on the Project. TR1 37 ¶¶ 17-25, 109 ¶¶ 7-14; TR2 96 ¶¶ 17-21. Under the Puerto Rico Civil Code, an enforceable contract exists when a plaintiff establishes (1) the contracting parties' consent; (2) a definite object of the contract; and (3) the parties' cause for the obligation. P.R. LAWS ANN. tit. 31, § 3391. Once the existence of a contract is established, "if the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties," the Court holds the parties to the literal sense of the terms. Id. § 3471; González v. John Hancock Mut. Life Ins. Co., 927 F.2d 659, 660 (1st Cir. 1991) (internal quotations omitted). In other words, "courts are barred from considering extrinsic evidence in a written contract where the terms are clear and unambiguous." Triangle Cayman Asset Co. v. LG and AC, Corp., 52 F.4th 24, 32 (1st Cir. 2022). Notwithstanding the foregoing, when there is evidence to establish that the intention of the contracting parties may be contrary to the terms of the contract, courts must inquire as to the parties' real intentions. Marcial v. Tomé, 144 P.R. Dec. 522, 535-36, 1997 WL 871183 (1997); see also P.R. LAWS ANN. tit. 31, § 3471 ("if the words should appear contrary to the evident intention of the contracting parties, the intention [ ] prevail[s]"). After all, "determining the real and common intent of the contracting parties is the fundamental criteria for contract interpretation under Puerto Rico law." Puerto Rico Telephone Co., Inc. v. SprintCom, Inc., 662 F.3d 74, 91 (1st Cir. 2011). This inquiry requires examination of the parties' prior, current, and subsequent acts to the formation of the contract. Id.

The express terms of the Subcontract clearly established that the contract was a lump sum all-inclusive contract as testified by Brunski. USIC relies on the language in Exhibit XX of the Subcontract to establish a different intent by the parties and to seek a reduction of the amount owed for lightweight concrete. But other than a reference to the language included in the exhibit of the Subcontract, USIC has not presented any evidence to counter the otherwise unambiguous term of the Subcontract and Brunski's unwavering testimony that the intent of the parties was for InSite to

pay for all lightweight aggregate and concrete for the Project regardless of the final price of the lightweight aggregate and concrete. See Marcial v. Tomé, 144 P.R. Dec. at 540 (whenever the interpretation of a contract is in question, the best way to corroborate the intent of the contracting parties is to present evidence at trial).

USIC also seeks to reduce the amount claimed by WCC for lightweight aggregate and concrete by relying on the opinion of its expert that the amount poured in concrete exceeded that which was included in the Project specifications and that such an excess was caused by WCC's deficient supervision of another subcontractor's work. See TR4 at pp. 37-42. USIC's expert's testimony that WCC must have been negligent in the supervision of another subcontractor was based on his observations of aerial photographs of the Project. The expert never visited the Project and his opinion was conclusory— if additional concrete was necessary, it must be because the steel work was defective and WCC failed to supervise the steel subcontractor. However, even taking at face value the opinion of the expert that the excess pour was a consequence of defective work by another subcontractor and failed supervision by WCC, under Article 1060 of the Puerto Rico Civil Code, the damages that may be recovered for a breach of contract claim include all those that the debtor in good faith could have foreseen and all those that could have been foreseen when the obligation was assumed. P.R. LAWS ANN. tit. 31, § 3024. In a construction project of this complexity and magnitude, it was entirely foreseeable for USIC that the costs incurred by WCC to complete the work of a defaulted subcontractor like InSite could exceed those included in the specifications of the Project. WCC is entitled to **$965,859.32** in reimbursement by USIC for the amounts incurred in lightweight aggregate and concrete.

    d.    <u>Excess Worker's Compensation</u>

WCC seeks reimbursement for excess worker's compensation in the amount of $77,880.35. See Docket No. 305 at p. 24. That claimed expense was the result of an audit performed by the Puerto Rico State Insurance Fund ("PRSIF") at the end of the Project. TR1 198 ¶¶ 6-25. But WCC did not present any evidence of the audit or of the PRSIF's computation of the amount owed for excess worker's compensation on account of InSite's scope of work. Indeed, WCC presented no evidence of actual payment of that amount by WCC. WCC relied solely on a summary prepared by a WCC employee that did not testify at trial. TR1 199 ¶¶ 13-25, 201 ¶¶ 6-17, 202 ¶¶ 18-25. Brunski testified that he did not participate in the audit or in the drafting of the internal report generated by WCC. As such, he had no personal knowledge of the audit or of the amount paid

<u>Walsh Construction v. United Surety & Indemnity Co.</u>
Civil No. 12-1401 (GLS)

because of the audit. TR1 205 ¶¶ 22-25, 206-211. Given the absence of any evidence on the audit performed by PRSIF, USIC's expert concluded that the amount claimed by WCC was merely an estimate. TR4 50 ¶¶ 8-25, 51 ¶¶ 1-8. USIC is not liable to WCC for this amount.

      e.     <u>Costs of Supervision and Labor of WCC Employees</u>

      WCC seeks reimbursement for costs of supervision and labor of WCC employees who worked to complete InSite's scope of work. WCC calculated this amount at $267,337.00. Docket No. 305 at p. 24. Brunski testified that the WCC employees who worked on completing InSite's scope of work were Eduardo Farry, José Resto, Craig Sutherland, Erich Sutherland, and Paul Smith. TR1 159 ¶¶ 1-13. Brunski testified that he verified and approved the hours worked by each of these employees to complete InSite's work on the Project. TR1 160 ¶¶ 10-18, 161 ¶¶ 17-24. But Brunski had no personal knowledge of information in payroll documents of WCC, and could not testify as to the amounts actually paid in salaries to these employees to complete InSite's scope of work or as to the time expended by each of the five (5) WCC employees in completing InSite scope of work. Without access to payroll documents or any direct testimony regarding the actual payments made, Brunski could not provide reliable proof of the exact amounts paid to these employees for completing Insite's scope of work. Moreover, expert testimony on these amounts has been deemed inadmissible. As a result, WCC did not meet its burden of proving the amount owed on account of WCC employees who had to complete InSite's scope of work.

      f.     <u>Extended General Conditions</u>

      WCC seeks reimbursement of $341,101.38 on account of four (4) months of extended general conditions due to InSite's failure to complete the work. The critical path of a project is a sequence of events that must happen in a certain order within a certain time frame so that the overall project can be completed in the time frame required by the contract. TR1 28 ¶¶ 15-18. If a scope of work is on a project's critical path and gets delayed, it has a negative impact in the project schedule because the trailing activities are not allowed to start or the duration of those trailing activities must be rearranged or shortened. TR1 29 ¶¶ 8-15. The credible testimony heard established that InSite's projected subcontracted work on the Project could impact the project schedule or the critical path. TR1 28 ¶¶ 9-12, 44 ¶¶ 2-25, 45 ¶¶ 1-7, 46 ¶¶ 1-15. According to Brunski, the Project was delayed for four (4) months during the months of December 2011, January 2012, February 2012, and March 2012 for reasons attributable to InSite. TR2 at 59 ¶¶ 24-25, 60 ¶¶ 1-7, 81 ¶¶ 1-10, 125 ¶¶ 18-24. There was credible evidence that WCC had to have WCC

employees spend more time on the Project to address the four (4) months of delay caused by InSite. These employees were Antonio Bobonis, Craig Sutherland, Erich Sutherland, Edward Farry, Monica Flores, José Resto, Steven Sawyer, and Anthony Paul Smith. These WCC employees were always paid through the duration of the Project. TR1 at pp. 187-194. There was also credible evidence that WCC had to pay the residential lease of four (4) of its employees for four (4) additional months. TR2 8 ¶¶ 7-24, 9 ¶¶ 1-12. WCC also had to pay the leased vehicles of four (4) of its employees for four (4) additional months. TR2 9 ¶¶ 13-25, 10 ¶ 1. And WCC had to pay for four (4) additional months of office expenses, including telephone, drinking water, internet, trailer rental, electricity, maintenance and other standard office expenses. TR2 10 ¶¶ 10-25. However, even though WCC presented testimony of the delay caused by InSite and the additional categories of general conditions incurred by WCC due to this delay, expert testimony on the amounts expended in each category has been deemed inadmissible. Other than Brunski's passing reference to an estimated monthly lease, WCC was unable to establish the amounts incurred by WCC and subject to reimbursement in extended general conditions of the Project.

### 4.    WCC's Claim of Bad Faith

Pursuant to Article 1060 of the Puerto Rico Civil Code, in cases of "dolo" or bad faith in the performance of a contractual obligation, the debtor may be liable for all damages which may clearly originate from the nonfulfillment of the obligation. P.R. LAWS ANN. tit. 31, § 3024. This would include all damages that may have clearly originated from the nonfulfillment of the obligation, and not just those that the debtor in good faith could have foreseen at the time when it assumed the obligation. Even though the Court made a finding of liability against USIC, to be liable for unforeseen damages, such a finding of liability would have to be followed by a determination that USIC acted in bad faith in the performance of its contractual obligations under the Puerto Rico Civil Code. See Docket No. 1 at pp. 4-5. WCC would have had to establish that USIC engaged in a conscious and deliberate purpose of avoiding the normal performance obligations under the Bond. Marquez v. Torres Campos, 111 P.R. Dec. 854 (1982), 11 P.R. Offic. Trans. 1085 at 1098 (quotations and citations omitted). To prove "conscious and deliberate" avoidance of an obligation, WCC was required to present evidence as to USIC's intention at the time it assumed its contractual obligation and the motivation and circumstances surrounding its decision to deny payment under the Bond. See Canales v. Pan Am., 112 D.P.R. 329, 338 (1982), 12 P.R. Offic. Trans. 411; Oriental Financial Group, Inc. v. Federal Ins. Co. Inc., 598 F.Supp.2d

199, 219 (D.P.R. Aug. 1, 2008) (quoting Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler, 92 F.Supp.2d 8, 18 (D.P.R. Mar. 16, 2000) ("A party acts with bad faith ('dolo') when it 'knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation.'")). WCC failed to present any such evidence. It merely relied on arguments pertaining to USIC's litigation posture and on the years of litigation between the parties. The Court cannot infer the bad faith required by the statute solely from USIC's litigation strategy. USIC is not liable to WCC for damages as a result of bad faith in the performance of its obligations under the Bond.

**5.    Attorneys' Fees and Costs**

Under the clear terms of the Bond, USIC is liable for "any additional legal and design professional costs resulting or arising from InSite's default or resulting or arising from actions or failure to act of USIC under the Bond." WCC is to submit its request for attorneys' fees and costs within the next fourteen (14) days.

## III.    Conclusion

The amount remaining in the InSite Subcontract was $1,701,477.00. WCC established costs and expenses amounting to $2,520,545.73 in the performance and completion of InSite's scope of work under the Subcontract. Therefore, USIC is liable for the reimbursement of **$819,068.73**, plus any reasonable amounts of attorneys' fees and costs, to WCC. Judgment to be entered accordingly.

**IT IS SO ORDERED.**
In San Juan, Puerto Rico, this 5th day of November, 2025.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge